UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-12169-GAO

STEADFAST INSURANCE COMPANY,
As Subrogee of The Museum of Fine Arts, Plaintiff,

v.

FORSYTH INTERNATIONAL, INC. d/b/a THE FORSYTH INSTITUTE and FORSYTH DENTAL
INFIRMARY FOR CHILDREN,
Defendants.

<u>ORDER ADOPTING REPORT AND RECOMMENDATION</u>
September 30, 2014

O'TOOLE, D.J.

The magistrate judge to whom this matter was referred has recommended that the defendants'
motion to dismiss be denied. The defendants have filed objections to the Report and Recommendation
("R&R"). After carefully reviewing the pleadings, the parties' submissions, the R&R, and the objection, I
agree with the magistrate judge's analysis and conclusions.

I add the following observation: Denial of the motion to dismiss does not resolve disputed factual
issues in the plaintiff's favor, but rather permits them to be explored at trial. Thus, for example, whether
the failure to obtain pollution insurance that was ultimately *effective* was a material breach of the lease
obligation to "maintain" pollution insurance may be a matter that turns on particular facts. But where
there are alternatives, dismissal is not warranted where which alternative prevails may depend on what
facts are proved or not at trial. The defendants' objection in this respect is in present circumstances not
persuasive.

Accordingly, I ADOPT the magistrate judge's recommendation. The defendants' Motions to
Dismiss (dkt. no. 6) is DENIED.

It is SO ORDERED.                    /s/ George A. O'Toole, Jr.
                                     United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEADFAST INSURANCE COMPANY,
as Subrogee of The Museum
of Fine Arts,
    Plaintiff,

      v.
                                      CIVIL ACTION NO.
                                            13-12169-GAO

FORSYTH INTERNATIONAL, INC.
d/b/a THE FORSYTH INSTITUTE
and FORSYTH DENTAL INFIRMARY
FOR CHILDREN,
    Defendants.

## REPORT AND RECOMMENDATION RE:
### DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL
### RULES OF CIVIL PROCEDURE 12(b)(6) AND 12(b)(1)
### (DOCKET ENTRY # 6)

**September 12, 2014**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to dismiss filed by
defendant Forsyth International, Inc. d/b/a The Forsyth Institute
and Forsyth Dental Infirmary for Children ("Forsyth") under
Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)"), and Fed.R.Civ.P.
12(b)(1) ("Rule 12(b)(1)"). (Docket Entry # 6). After
conducting a hearing on August 14, 2014, this court took the
motion (Docket Entry # 6) under advisement.

<u>PROCEDURAL BACKGROUND</u>

Steadfast Insurance Company ("Steadfast"), as subrogee of
the Museum of Fine Arts ("MFA"), filed this action seeking to
recover funds it paid to or on behalf of the MFA for
environmental clean up costs under an insurance policy issued to
the MFA ("the Steadfast policy"). Forsyth, a non-profit dental

research corporation, occupied property located at 140 The Fenway in Boston, Massachusetts ("the property") under a lease with the MFA and purportedly released hazardous material, including mercury, into the sewer system during the lease.

The complaint sets out a cause of action under section four of Massachusetts General Laws chapter 21E ("chapter 21E") (Count I) against Forsyth as the entity liable for the release. Count II asserts that Forsyth negligently released the hazardous material and Count III seeks indemnification from Forsyth as the entity primarily at fault. In Count V, Steadfast alleges that Forsyth materially breached the lease with the MFA.[1]

The lease between the MFA and Forsyth included a clause that waived all claims and causes of action against the other party resulting from perils insured against under any insurance policy maintained by either party up to the amount of any recovery under the policy.[2] (Docket Entry # 4, § 5.6). Forsyth argues that this waiver of rights clause bars Steadfast, which stands in the shoes of the MFA, from maintaining all of the foregoing causes of action. The issue is one of first impression in this circuit. Forsyth additionally submits that the chapter 21E claim fails

---

[1] The complaint does not contain a count designated under Roman numeral IV.

[2] The caption of this clause denominates it as a "Waiver of Rights." The complete language of the clause is set out in the discussion section.

because Steadfast did not give proper notice and respond to Forsyth's request for further information.  <u>See</u> Mass. Gen. L. ch. 21E, § 4A.

Jurisdiction is based on the diversity of the parties.  28 U.S.C. § 1332.  Steadfast is a Delaware corporation with a principal place of business in Illinois and Forsyth is a Massachusetts corporation with a principal place of business in Massachusetts.

STANDARD OF REVIEW

Forsyth moves to dismiss the complaint under both Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim.  Steadfast initially submits that Forsyth fails to clearly articulate what claims it seeks to dismiss under Rule 12(b)(6) as opposed to Rule 12(b)(1).  (Docket Entry # 10, n.1).  To the contrary, Forsyth argues that Steadfast's failure to comply with the notice requirements of section 4A of chapter 21E deprives "this Court of subject matter jurisdiction over the claim."  (Docket Entry # 7).  Forsyth therefore seeks to dismiss all of the claims under Rule 12(b)(6) and the chapter 21E claim under Rule 12(b)(1).

The standard of review for a Rule 12(b)(6) motion is well established.  To survive a Rule 12(b)(6) motion to dismiss, the complaint must include factual allegations that when taken as true demonstrate a plausible claim to relief even if actual proof

of the facts is improbable. Bell Atlantic v. Twombly, 550 U.S. 544, 555-558 (2007). Thus, while "not equivalent to a probability requirement, the plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully." Boroian v. Mueller, 616 F.3d 60, 65 (1st Cir. 2010) (internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not shown that the pleader is entitled to relief." Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011) (internal quotation marks, brackets and citations omitted). Discarding legal conclusions and taking the facts in the governing complaint as "true and read in a plaintiff's favor," the complaint "must state a plausible, not a merely conceivable, case for relief." Sepúlveda-Villarini v. Dept. of Educ. Of Puerto Rico, 628 F.3d 25, 29-30 (1st Cir. 2010).

In reviewing a complaint, a court considers the complaint and any documents attached to it. Fed.R.Civ.P. 10(c) ("an exhibit to a pleading is a part of the pleading for all purposes"). The lease attached to the complaint is therefore part of the Rule 12(b)(6) record. In evaluating a Rule 12(b)(6) motion, the court may also consider a limited category of documents outside the complaint without converting the motion

4

into one for summary judgment.[3] Such documents include public records and documents sufficiently referred to in the complaint. See Butler v. Balolia, 736 F.3d 609, 611 (1st Cir. 2013) (supplementing facts in complaint "by examining 'documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice'"); Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013) (court may consider "'official public records; documents central to plaintiffs' claim; and documents sufficiently referred to in the complaint'") (ellipses and internal brackets omitted); Giragosian v. Ryan, 547 F.3d 59, 65-66 (1st Cir. 2008) (court can consider documents relied on in complaint, public records, and other documents subject to judicial notice).

The complaint sufficiently refers to the following documents which Steadfast attaches to the opposition to the motion: (1) an October 10, 2008 penalty assessment notice ("PAN") issued by the Massachusetts Water Resources Authority ("MWRA") to Forsyth (Docket Entry # 1, ¶ 12(b)) (Docket Entry # 10-4); (2) an April 23, 2009 settlement agreement between the MWRA and Forsyth requiring Forsyth to pay $25,000 and to sample and report mercury from a designated location at the property (Docket Entry # 1, ¶

---

[3] In a footnote in the opposition to the motion to dismiss, Steadfast refers to this court's ability to consider the motion as a summary judgment motion under Rule 56. (Docket Entry # 10, n.4). This court will treat the motion as a motion to dismiss.

5

12(c)) (Docket Entry # 10-5); (3) Massachusetts Department of
Environmental Protection ("MDEP") hazardous waste manifests
documenting shipments of hazardous waste, including mercury, from
the property during the lease (Docket Entry # 1, ¶ 12(d)) (Docket
Entry # 10-6); (4) MWRA inspection reports indicating continued
discharge of mercury "into the plumbing waste system" during the
lease (Docket Entry # 1, ¶ 12(e)) (Docket Entry # 10-7); and (5)
an April 20, 2011 letter from MFA attorney Peter Friedenberg
("Attorney Friedenberg") to Forsyth (Docket Entry # 1, ¶ 15)
(Docket Entry # 10-8). Accordingly, these documents comprise
part of the Rule 12(b)(6) record.

## FACTUAL BACKGROUND

On September 27, 2007, the MFA, as the landlord, and
Forsyth, as the tenant, executed a lease ("the lease") of the
property owned by the MFA. The lease reflects that Forsyth
continuously occupied the property, which included a building,
"for many years" prior to the lease. (Docket Entry # 4, § 2.2).
The two year term allowed for a one year extension. MDEP
manifests indicate that Forsyth was still leasing the property in
January 2010.

The lease allowed Forsyth, which conducts dental research,
to engage in certain "permitted uses" consisting of laboratory
work, research and development work and related office work. It
anticipated that Forsyth would procure certain insurance for the

6

premises. Article V required Forsyth to maintain casualty insurance, commercial general liability insurance and pollution liability insurance throughout the term of the lease. (Docket Entry # 4, §§ 5.1, 5.2, 5.3). Section 5.3 explicitly required Forsyth to maintain, at its sole cost, pollution liability insurance in the amount of $1,000,000 "covering first and third party claims for clean-up costs, personal injury and property damage."[4] (Docket Entry # 4, § 5.3). The section also required that the policy name the MFA or the MFA's agents as additional insureds. (Docket Entry # 4, § 5.3.1).

The lease additionally required Forsyth to comply with all relevant environmental laws.[5] The applicable language states that:

> Tenant, at its sole cost and expense, shall comply with all laws, statutes, ordinances, rules and regulations of any local, state or federal governmental authority having jurisdiction concerning environmental, health and safety matters (collectively "Environmental Laws"), including, but not limited to, *any discharge into* the air, surface water, *sewers*, soil or groundwater of any Hazardous Material, whether within or outside the Building and on or about the Premises.

(Docket Entry # 4, § 4.11.1) (emphasis added). The lease

---

[4] The coverage did not need to include pre-existing environmental conditions at the property prior to the lease term. Steadfast argues that Forsyth materially breached this insurance coverage provision thereby allowing the MFA to avoid its obligations under the lease and pursue a claim against Forsyth notwithstanding the waiver of rights clause.

[5] Again, Steadfast maintains that Forsyth materially breached this provision.

7

permitted Forsyth to avoid liability regarding environmental

conditions if it could show that the condition existed before the

September 27, 2007 commencement date of the lease. (Docket Entry

# 4, § 4.11.1).

The lease only allowed Forsyth to use hazardous material at

the property if it stored, used and disposed of the material in

accordance with environmental laws. The relevant language

imposing this obligation reads as follows:

> Tenant shall not cause or permit any Hazardous Material to
> be brought upon, kept or used in or about the Premises by
> Tenant . . . without the prior written consent of Landlord,
> except for Hazardous Materials which are typically used in
> the operation of a biomedical research facility,
> laboratories or offices, provided such materials are stored,
> used and disposed of in strict compliance with all
> applicable Environmental Laws and with good scientific and
> medical practice . . . Tenant shall not dispose of Hazardous
> Materials from the Premises to any location except in strict
> compliance with all applicable Environmental Laws.

(Docket Entry # 4, § 4.11.2). The broad definition of "Hazardous

Materials" in the lease encompassed mercury. (Docket Entry # 4,

§ 4.11.2).

The lease placed the obligation on Forsyth to perform any

removal and remediation and to indemnify the MFA for any clean up

costs that the MFA incurred regarding the discharge of hazardous

materials spilled or released by Forsyth after the September 27,

2007 commencement date.[6] In pertinent part, section 4.11.4

---

[6] Steadfast likewise contends that Forsyth materially
breached this provision by not fulfilling its responsibility to
remove and remediate the mercury discharged into the sewer

8

states that:

> Without limiting any of the foregoing, if any Hazardous Materials first introduced after the Commencement Date in, on or about the Premises by Tenant . . . result in any contamination of the Premises or any other property such that applicable Environmental Laws require the investigation, response action, removal or remediation or other action, Tenant shall promptly undertake such investigation, response action, removal or remediation or other action and shall perform the same in accordance with all applicable Environmental Laws.

(Docket Entry # 4, § 4.11.4). The MFA was not liable to Forsyth "for any release of Hazardous Materials brought to the Premises by or on behalf of Tenant at any time during the Term" of the lease. (Docket Entry # 4, § 4.11.3). In short, as between the parties, the contract placed the risk of environmental contamination during the lease and the cost for any clean up or discharge on Forsyth as opposed to the MFA. As between either party and an insurance company, the effect of the waiver of rights clause placed the risk and costs of clean up on the insurance company up to the amount of the insurance recovery.[7]

During the lease, Forsyth operated a dental research laboratory. MWRA inspection reports indicate that Forsyth used to conduct dental hygienist classes at the facility although now

_____

system.

[7] As discussed infra, principles of subrogation preclude an insurance company from recovering more than the amount paid and recovered by the MFA. Above and beyond the amount paid by an insurance company, the MFA retained the ability to recover excess environmental contamination losses from Forsyth under the terms of the lease.

9

such classes are performed "off site in other institutions."[8] (Docket Entry # 10-7). Dental school students and faculty dentists formerly provided free teeth cleanings and dental fillings to Boston children in an operatory area at the facility. The operatory area had a vacuum system and associated piping which plumbed to a neutralization system at the facility. One inspection report notes that, when the "piping was removed," analysis of "pipe sediment indicated very high mercury concentrations." (Docket Entry # 10-7). As stated in the complaint, "Forsyth's activities" during the lease "contaminated several areas of the property including, but not limited to, the glass drain piping in the laboratory, the vacuum system in the rotunda, and the plumbing and drain system." (Docket Entry # 1, ¶ 11).

MWRA's involvement with the discharges at the property occurred throughout the lease. On December 10, 2007, it issued a notice of noncompliance and order to Forsyth notifying it of repeated discharges of mercury from the property into the Boston sewer system. On October 10, 2008, the MWRA issued the PAN based on Forsyth's continued discharge of mercury in excess of regulatory limits. In total, the PAN assessed a $77,000 fine for discharges of excessive amounts of mercury into the sanitary

---

[8] These facts, taken from the inspection reports, are provided for background purposes. They are not material to the waiver argument.

10

sewer system on 14 different dates from March to July 2008.

Forsyth appealed the fine and the parties entered into the settlement agreement. The April 13, 2009 agreement reduced the fine to $25,000 and imposed sampling and reporting obligations on Forsyth. Although the agreement stated it was not an admission of liability or evidence that Forsyth violated any law, it set out nine additional dates from July to December 2008 where sampling revealed similar levels of mercury "from the neutralization system" before "mixing with any other stream." (Docket Entry # 10-5). Testing by the MWRA revealed that mercury levels in the wastewater from the property from 2007 to 2009 did not substantially decline.

Forsyth vacated the property at the conclusion of the lease and failed to properly decontaminate the property. On April 20, 2011, Attorney Friedenberg informed Forsyth that the MFA intended to hold Forsyth responsible for the mercury contamination. The letter identified various provisions of the lease to support the MFA's position.

In light of Forsyth's failure to undertake a full remediation or other appropriate action, the MFA addressed the contamination at the property and submitted a claim for the cost to Steadfast under the Steadfast policy. Steadfast paid for the clean up costs under "the terms and conditions of the policy" (Docket Entry # 1, ¶ 17) and presently seeks reimbursement "to

the extent of its [insurance] payments" (Docket Entry # 1, ¶ 17) from Forsyth.

## DISCUSSION

Forsyth seeks to dismiss all of the claims in the complaint based on the aforementioned waiver of rights clause in the lease. Steadfast submits that Forsyth's material breach of the contract allows the MFA and Steadfast, as subrogee, to avoid the terms of the clause and pursue a statutory chapter 21E claim as well as negligence, breach of contract and indemnity claims against Forsyth. Placing the clause in the context of the lease, Steadfast points out that the parties allocated the risk of loss and the responsibility for remediating environmental contamination solely on Forsyth. According to Steadfast, Forsyth cannot breach the contract by violating environmental laws, not undertaking the removal and remediation of environmental contamination and not maintaining pollution liability insurance and then avoid all liability under the waiver of rights clause.

Steadfast additionally argues that: (1) public policy precludes enforcement of the waiver of rights clause; and (2) it has an independent chapter 21E cause of action as a "person" who responded to the release of hazardous materials and is "entitled to reimbursement from any other person liable" for the release within the meaning of chapter 21E. Mass. Gen. L. ch. 21E, § 4. Forsyth contends that the complaint fails to plead that Steadfast

12

complied with the procedural requirements of section 4A which allow suit "[o]nly after notice has been given and after the procedures described in this section have been carried out." Mass. Gen. L. ch. 21E, § 4A.

Massachusetts substantive law applies where, as here, jurisdiction is based on diversity of citizenship. <u>Alejandro -Ortiz v. Puerto Rico Elec. Power Authority (PREPA)</u>, 756 F.3d 23, 26-27 (1st Cir. 2014) ("state substantive law and federal rules for procedural matters" apply in diversity action). When sitting in diversity, the "'objective is solely to determine what is the law as indicated by [the state's] authoritative sources.'" <u>Id.</u> at 27. Decisions rendered by the state's highest court constitute "[t]he most reliable guide" to determine state law. <u>Butler v. Balolia</u>, 736 F.3d at 612. Where, as here, there is no decision by the Massachusetts Supreme Judicial Court ("SJC") that directly addresses the application of a subrogation waiver of rights clause in the face of a material breach, the court consults and examines the kinds of sources that the SJC "would be apt to consult." <u>Id.</u> at 613 (interpreting Washington state law). "[A]s a general matter," a court examining Massachusetts law often begins "by inspecting analogous decisions of the" SJC and then "decisions of the lower courts of" Massachusetts, "precedents in other jurisdictions," learned treatises and public policy rationales. <u>Andrew Robinson Intern., Inc. v. Hartford</u>

13

<u>Fire Ins. Co.</u>, 547 F.3d 48, 51-52 (1st Cir. 2008); <u>see</u> <u>Butler v.</u>
<u>Balolia</u>, 736 F.3d at 613.

The principles of subrogation are well established in
Massachusetts. An insurer who pays an insured's claim "succeeds
to any right of action the insured may have against the parties
allegedly responsible for the loss." <u>Liberty Mutual Ins. Co. v.</u>
<u>National Consol. Warehouses, Inc.</u>, 609 N.E.2d 1243, 1246
(Mass.App.Ct. 1993); <u>accord</u> <u>New England Gas & Elec. Ass'n v.</u>
<u>Ocean Acc. & Guarantee Corp.</u>, 116 N.E.2d 671, 683 (Mass. 1953)
("general rule is well established that upon the payment of a
loss the insurer is entitled to be subrogated pro tanto to any
right of action which the insured may have against a third person
whose negligence or wrong caused the loss"). The insurer is also
"subject to any defenses that would bar" the insured's right of
action. <u>North American Specialty Ins. Co. v. Payton Construction</u>
<u>Corp.</u>, 953 N.E.2d 233, 234 (Mass.App.Ct. 2011). In essence, the
insurer, as subrogee, "stands in the shoes" of the insured, the
subrogor, and its "rights by subrogation are no greater than the
rights of the insured." <u>Liberty Mutual Ins. Co. v. National</u>
<u>Consol. Warehouses, Inc.</u>, 609 N.E.2d at 1246; <u>see</u> <u>Harvard Trust</u>
<u>Co. v. Racheotes</u>, 147 N.E.2d 817, 818 (Mass. 1958) (insurer "is
subrogated to the rights of Harvard in whose name the action is
brought and stands in Harvard's shoes"); <u>Home Owners' Loan Corp.</u>
<u>v. Baker</u>, 12 N.E.2d 199, 201 (Mass. 1937) ("'[i]n any form of

remedy, the insurer can take nothing by subrogation but the
rights of the assured'").

The language of the waiver of rights clause reads as
follows:

> Waiver of Rights. All claims, causes of action and rights
> of recovery for any damage to or destruction of persons,
> property or business which shall occur on or about the
> Premises which result from any of the perils insured under
> any and all policies of insurance maintained by Landlord and
> Tenant, are waived by each party against the other party, .
> . ., but only to the extent recovery, if any, under such
> policy or policies of insurance; *provided, however*, that
> this waiver shall be null and void to the extent that any
> such insurance shall be invalidated by reason of this
> waiver.

(Docket Entry # 4, § 5.6) (emphasis in original). Case law

commonly refers to such a clause as a waiver of subrogation

clause and it often appears in construction contracts. See

Haemonetics Corp. v. Brophy & Phillips Co., Inc., 501 N.E.2d 524,

525-526 (Mass.App.Ct. 1986) (describing similar clause as waiver

of subrogation clause); Behr v. Hook, 787 A.2d 499, 501 n.1 & 503

(Vt. 2001) ("standardized waiver-of-subrogation clause in a

construction contract" exculpates each party from loss or damage

to the extent covered by insurance).[9]

Turning to Steadfast's public policy argument, Steadfast

---

[9] Accordingly, to avoid confusion, this court refers to the
waiver of rights clause as a subrogation waiver clause. In a
separate section, the lease required the parties to obtain a
waiver of subrogation in their insurance policies "[t]o the
extent to which a waiver of subrogation clause is available."
(Docket Entry # 4, § 5.5).

15

maintains that the subrogation waiver clause cannot allow Forsyth
to violate statutory rights, particularly those in chapter 21E
because the statute prevents the release of dangerous hazardous
materials and protects the safety of the public. It is true that
a contract purporting to exempt a party "from liability to [the
injured party] for injuries resulting from its negligence or that
of its employees . . . cannot serve to shield the [negligent
party] from responsibility for violation of a statutory duty."
Henry v. Mansfield Beauty Academy, Inc., 233 N.E.2d 22, 24 (Mass.
1968). It is also true that, based on public policy grounds, a
liability release does not exempt a defendant/wrongdoer from his
own grossly negligent conduct. Zavras v. Capeway Rovers
Motorcycle Club, Inc., 687 N.E.2d 1263, 1265 (Mass.App.Ct. 1997).

     Liability releases in contracts however are different from
subrogation waivers insofar as the former leave the victim
without recourse and without compensation. See Middleoak Ins.
Co. v. Tri-State Sprinkler Corp., 931 N.E.2d 470, 471 n.3
(Mass.App.Ct. 2010); Great Northern Ins. Co. v. Architectural
Environments, Inc., 514 F.Supp.2d 139, 143 (D.Mass. 2007). It is
for that reason that the Massachusetts Appeals Court ("the
appeals court") in Middleoak relegated to a footnote the
plaintiff's argument that a subrogation waiver was "unenforceable
because the defendants cannot waive liability for the violation
of a statutory duty." Middleoak Ins. Co. v. Tri-State Sprinkler

16

<u>Corp.</u>, 931 N.E.2d at 471 n.3. The court explained that:

> Unlike a provision that completely exculpates a wrongdoer
> and leaves the victim without recourse, a waiver of
> subrogation does not prevent an injured party from being
> compensated. <u>See</u> <u>Great N. Ins. Co. v. Architectural Envts.,</u>
> <u>Inc.</u>, 514 F.Supp.2d 139, 143 (D.Mass. 2007). A waiver of
> subrogation serves as an allocation of risk between the
> parties. It reflects "an intention on the part of the
> parties to relieve each other of liability and look only to
> one insurer to bear the risk of the fire instead." <u>Ibid.</u>,
> quoting from <u>Acadia Ins. Co. v. Buck Constr. Co.</u>, 756 A.2d
> 515, 520 (Me. 2000). Where, as here, the injured party is
> compensated by insurance, the contractual waiver of
> subrogation is enforceable.

<u>Id.</u>; <u>see</u> <u>Metlife Auto & Home v. ADT Security Systems, Inc.</u>, 2011

WL 1223023, at *6 (D.Mass. March 31, 2011) (discussing <u>Middleoak</u>,

931 N.E.2d at 471 n.3, and noting that, "[w]aivers of subrogation

provisions are valid under Massachusetts law"). Here, the MFA

received compensation from Steadfast under the Steadfast policy.

The case relied upon by Steadfast, <u>A.C. Moore Arts & Crafts, Inc.</u>

<u>v. Fellsway Plaza, LP</u>, 2007 WL 3260987, at *3 (Mass.Super. Oct.

9, 2007), fails to make this distinction.

Although the <u>Middleoak</u> decision did not involve the

statutory violations of chapter 21E alleged in the case at bar,

there is little reason not to extend the court's reasoning and

reject Steadfast's public policy argument. Waivers of

subrogation constitute "an allocation of risk among insurers" as

opposed to a surrender of rights against a defendant by the

insured. <u>Middleoak Ins. Co. v. Tri-State Sprinkler Corp.</u>, 931

N.E.2d at 472. The "allocation comports with a strong public

policy to encourage parties to anticipate risks and procure insurance covering those risks, thereby avoiding future litigation." Id. Subrogation waivers reduce the prospect of litigation between the contracting parties because they shift the risk of loss to an insurance company. Behr v. Hook, 787 A.2d at 503; see Haemonetics Corp. v. Brophy & Phillips Co., Inc., 501 N.E.2d at 526 (subrogation waiver "avoids disruption and disputes among" parties to a construction project because it "eliminates the need for lawsuits, and yet protects the contracting parties from loss" though insurance). Moreover, the insurance company can protect itself from "unknown subrogation waivers" by "inserting policy exclusions into its policies, raising premiums, investigating waivers by potential insureds, requiring warranties from insureds, or obtaining reinsurance to cover subrogation waivers." Middleoak Ins. Co. v. Tri-State Sprinkler Corp., 931 N.E.2d at 472 n.5. Finally, two of the cases Steadfast uses to support the public policy argument[10] are distinguishable for the reasons stated in Amica Mut. Ins. Co. v. Bergmeyer Associates, Inc., 2008 WL 526032, at *3 (Mass.Super. Jan. 4, 2008). In sum, Steadfast's public policy argument does not provide a means to avoid the waiver of subrogation in the lease.

---

[10]    Federal Insurance Co. v. CBT/Childes Bertman Tseckares, Inc., 2007 WL 1630687 (Mass.Super. May 25, 2007); Federal Insurance Co. v. Cogswell Sprinkler Co., Inc., 2005 WL 4169716 (D.Mass. Feb. 15, 2005).

Turning to the material breach argument, "'A material breach of contract by one party excuses the other party from performance as [a] matter of law.'" Coviello v. Richardson, 924 N.E.2d 761, 766 (Mass.App.Ct. 2010); Teragram Corporation v. Marketwatch.com, Inc., 444 F.3d 1, 11 (1st Cir. 2006) ("'material breach by one party excuses the other party from further performance under the contract'") (quoting Lease-It, Inc. v. Massachusetts Port Authority, 600 N.E.2d 599, 602 (Mass.App.Ct. 1992)). This principle applies to leases. See DiBella v. Fiumara, 828 N.E.2d 534, 538 (Mass.App.Ct. 2005).

"A material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the contract.'" Lease-It, Inc. v. Massachusetts Port Authority, 600 N.E.2d at 602 (quoting Bucholz v. Green Brothers Co., 172 N.E. 101, 102 (Mass. 1930)); accord Teragram Corporation v. Marketwatch.com, Inc., 444 F.3d at 11 (also quoting Bucholz); see also Aerostatic Engineering Corp. v. Szczawinski, 294 N.E.2d 521, 523 (Mass.App.Ct. 1973) ("a substantial breach going to the root of the contract" entitles non-breaching party to terminate performance). For purposes of the motion to dismiss, more than sufficient facts exist to establish that Forsyth breached the obligation to comply with environmental laws by discharging mercury in excess of legal limits from the neutralization system into the Boston sewer system. Forsyth also breached the

19

requirement to undertake response action and remove and remediate
the contamination at the property that resulted from Forsyth's
use of hazardous materials after the start date of the lease.
Facts in the complaint additionally demonstrate that Forsyth
breached the requirement to maintain pollution liability
insurance.  Independently or combined and in light of the
standard of review applicable to a motion to dismiss, these
breaches amount to material breaches of the lease for purposes of
resolving the motion to dismiss.

Using appropriate sources to decipher Massachusetts law, the
issue reduces to whether Massachusetts law would uphold the
waiver of subrogation in light of these material breaches.
Although there is a dearth of authority from the SJC, one appeals
court decision rejected an alleged material breach of the waiver
of subrogation clause itself as rendering the waiver
unenforceable.  North American Specialty Ins. Co. v. Payton
Const. Corp., 953 N.E.2d at 234-236.  The decision in Payton
therefore warrants examination.

The decision involved a construction contract between the
owner of a building that caught fire and a general contractor.
The subrogation clause waived the owner's and the general
contractor's rights to proceed against each other for damages
caused by fire or other causes "to the extent covered by property
insurance . . . applicable to the Work."  Id. at 234.  The same

20

section of the contract required the general contractor to procure similar subrogation waivers from various subcontractors. Id. The general contractor did not obtain a waiver from one of the subcontractors. Id. The owner's insurer, the subrogee, therefore argued that the subrogation waiver clause was unenforceable because the general contractor's failure to obtain the waiver from one of the subcontractors "was a material breach of the AIA contract rendering the entire subrogation waiver void." Id. at 235. Here too, Steadfast argues that the wrongdoer (Forsyth) materially breached the contract thereby rendering the waiver of subrogation clause unenforceable.

Instead of summarily dismissing the material breach argument, the Payton court discussed and relied upon two state court cases, one from Vermont, Behr v. Hook, 787 A.2d at 505-506, and another from Connecticut, Best Friends Pet Care, Inc. v. Design Learned, Inc., 823 A.2d 329, 336-337 (Ct. 2003). In a footnote, the Payton court stated that the breach "appears to be an immaterial breach" but the court did not rest the decision on this finding. North American Specialty Ins. Co. v. Payton Const. Corp., 953 N.E.2d at 235 n.3. Instead, the court utilized principles of contract interpretation to conclude that the breach of the requirement to obtain subrogation waivers from the subcontractors within the subrogation waiver provision was not material. Id. at 235-236.

21

Forsyth's counsel acknowledges, accurately, that none of the other cases he provided the court during oral argument addresses the exact material breach argument raised by Steadfast. Forsyth's attempt to limit the reach of Payton to material breaches of the subrogation waiver provision is not convincing. The court's analysis did not rely on the fact that the breached provision appears in the same provision as the subrogation waiver clause.

In adopting the rational of Behr and extensively quoting that decision, the appeals court in Payton noted that, "'the primary purpose'" of the subrogation waiver provision "'was to protect the contractor and its subcontractors from liability for accidental property loss.'" Id. at 235 (quoting Behr v. Hook, 787 A.2d at 505-506). The primary purpose of the subrogation waiver clause in the case at bar was to protect the parties from liability to the extent of a recovery under an insurance policy and to shift the loss to an insurance company. See id.; Best Friends Pet Care, Inc. v. Design Learned, Inc., 823 A.2d at 332, 337 (interpreting language in similar subrogation waiver and agreeing with lower court "that the clearly expressed intent of the contract was that parties to the contract waive all subrogation claims against each other").

Overall, the appeals court in Payton recognized that a material breach of the subrogation waiver provision may provide a

basis to invalidate the subrogation waiver.  North American
Specialty Ins. Co. v. Payton Const. Corp., 953 N.E.2d at 235-236.
The court however found that the breach at issue was not
material.  Id.  The decision therefore supports the premise that
a material breach may render a subrogation waiver unenforceable.
It nevertheless does not answer the precise issue of whether a
material breach of the requirement to maintain insurance
constitutes a material breach of the subrogation waiver clause
and thereby renders the clause unenforceable.  Precedents in
other jurisdictions however constitute a source that the SJC is
apt to consult.  See Andrew Robinson Intern., Inc. v. Hartford
Fire Ins. Co., 547 F.3d at 51-52; Butler v. Balolia, 736 F.3d at
613.

One such precedent holds that a tenant which breached a
provision in a lease requiring it to obtain liability insurance
in a set amount was not entitled to enforce a waiver of
subrogation clause.  Liberty Mutual Insurance Co. v. Perfect
Knowledge, Inc., 752 N.Y.S.2d 677 (N.Y. App. Div. 2002).  In
Perfect Knowledge, the insurer paid a claim for fire damage to
its insured, the owner of the property, and asserted a
subrogation claim against the tenant and the tenant's contractor.
Id. at 678.  The lease between the owner and the tenant required
the latter to obtain liability insurance naming the owner as an
insured in an amount of $3,000,000.  Id. 678-679.  The tenant

only procured $2,000,000 in coverage and additionally failed to comply with another provision in the lease. Id. Reasoning that "[w]ithout the procurement of insurance, the shifting envisioned under the agreement could not take place, and the agreement was frustrated," the court and concluded that the tenant was not entitled to enforce the subrogation waiver provision. Id. at 679 (upholding lower court's summary judgment ruling in insurer's favor).

In the case at bar, the parties intended that Forsyth would maintain a pollution liability policy naming the MFA as an additional insured in the amount of $1,000,000. Forsyth did not maintain a pollution liability insurance policy and thereby materially breached section 5.3.1 of the lease. The waiver of subrogation clause is necessarily premised on the procurement of insurance and the lease placed that responsibility entirely on Forsyth. (Docket Entry # 4, §§ 5.1, 5.2, 5.3). The shifting the parties intended to occur through Forsyth maintaining a pollution liability insurance policy did not take place. In light of Payton, which recognizes the premise that a material breach may render a subrogation waiver unenforceable, and Perfect Knowledge, 752 N.Y.S.2d at 678-679, which holds that a tenant's failure to procure insurance in a lease prevents it from enforcing the subrogation waiver provision in the lease, Forsyth's reliance on the subrogation waiver clause to dismiss the claims under Rule

24

12(b)(6) is unavailing.[11] It is therefore not necessary to address Steadfast's alternative argument that it has an independent chapter 21E claim irrespective of the subrogation waiver clause.

Forsyth next seeks to dismiss the chapter 21E claim because the complaint fails plead that Steadfast satisfied the procedural prerequisites in section 4A of chapter 21E. As framed, the argument seeks a dismissal under Rule 12(b)(6). (Docket Entry # 7, p. 7) (chapter 21E count "fails to state a claim upon which relief may be granted" because of the failure to plead the procedural prerequisites). Forsyth separately asserts that Steadfast's failure to comply with section 4A "deprives this Court of subject matter jurisdiction over the claim." (Docket Entry # 7). Steadfast maintains that it provided adequate notice and, alternatively, section 4A does not require perfect notice and Forsyth had no interest in resolving the claim under the procedures in section 4A.

Section 4A sets out a procedure for a plaintiff to notify potentially responsible parties of their liability for a release of hazardous material. The notice must describe any response action undertaken by the plaintiff or the response action the

---

[11] This court expresses no opinion on the merits of a summary judgment motion raising the material breach argument. Nor should the findings in this opinion provide the law of the case relative to a more developed record on summary judgment.

plaintiff intends to undertake. Mass. Gen. L. ch. 21E, § 4A. The notice must also include the basis for the plaintiff's claim that the other person is liable. Mass. Gen. L. ch. 21E, § 4A. Section 4A then requires "the responder" to respond to the notice within 45 days. Mass. Gen. L. ch. 21E, § 4A. In addition to other items, "[t]he response shall . . . request any further information or documentation the responder needs to fully evaluate the notifier's claim." Mass. Gen. L. ch. 21E, § 4A. Within 60 days after receiving the response, "the notifier" and "the responder" must "confer in good faith" to resolve the disputes between them. Mass. Gen. L. ch. 21E, § 4A. The statute includes a framework for the parties to use mediation or arbitration to resolve their disputes. Mass. Gen. L. ch. 21E, § 4A. It is "[o]nly after notice has been given and after the procedures described in this section have been carried out" that the plaintiff may commence a civil action against the responder. Mass. Gen. L. ch. 21E, § 4A.

Notification under section 4A is a required condition to initiate a lawsuit under chapter 21E. <u>Buddy's Inc. v. Town Of Saugus</u>, 816 N.E.2d 134, 139 (Mass.App.Ct. 2004); <u>see</u> <u>Scott v. NG U.S. 1, Inc.</u>, 881 N.E.2d 1125, 1136 (Mass. 2008) (citing <u>Buddy's</u>, 816 N.E.2d at 139). "Minor inaccuracies, omissions, and errors in the contents of the § 4A letter" however do not prevent the plaintiff from filing suit when the plaintiff complies with "all

other procedural requirements of § 4A." <u>Bank v. Thermo Elemental</u> <u>Inc.</u>, 888 N.E.2d 897, 922 (Mass. 2008). The notice requirements are "designed to encourage parties to settle environmental liability suits without formal litigation proceedings." <u>Zecco,</u> <u>Inc. v. The Travelers, Inc.</u>, 938 F.Supp. 65, 67 (D.Mass. 1996).

The complaint states that correspondence from MFA representatives to Forsyth representatives, "including, but not limited to," the April 20, 2011 letter provided Forsyth notice of its responsibility "for the release of hazardous substances at the property and of Forsyth's liability for the reasonable costs of the action necessary to address the contamination as a result of the release of these hazardous substances." (Docket Entry # 1, ¶ 15). The April 20, 2011 letter outlines the basis for Forsyth's liability primarily in terms of Forsyth's violations of the lease. The letter also reflects Steadfast's intent to hold Forsyth liable for the mercury contamination at the property to the fullest extent possible "under applicable law." (Docket Entry # 10-8).

The complaint's reference to additional correspondence that notifies Forsyth of its responsibility makes it plausible that Forsyth provided sufficient notice under section 4A. In seeking to dismiss the chapter 21E claim under Rule 12(b)(6), Forsyth relies on a May 2013 letter its counsel sent to Steadfast's counsel in response to an April 2013 letter from Steadfast's

counsel to Karen A. Mullen, Esq. (Docket Entry # 7-1). The letter does not fall within any of the limited exceptions to the rule that confines Rule 12(b)(6) review to the complaint. It therefore fails to provide a basis to dismiss the chapter 21E claim under Rule 12(b)(6).

As a final matter, Forsyth summarily asserts that Steadfast's failure to respond to the request for information in the May 2013 letter "deprives this Court of subject matter jurisdiction over the claim." (Docket Entry # 7). Forsyth does not elaborate upon the basis for the lack of subject matter jurisdiction. Jurisdiction is properly based on the complete diversity of the parties and the complaint seeks a sum in excess of $75,000. Accordingly, subject matter jurisdiction exists and a Rule 12(b)(1) dismissal for lack of subject matter jurisdiction is not well founded.

If Forsyth is seeking to argue that Steadfast lacks statutory standing, it does not properly or adequately present the argument. Forsyth does not refer to Steadfast's standing to maintain the chapter 21E claim. See Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) ("district court was 'free to disregard' the state law argument that was not developed in Coons's brief"); see also U.S. v. Caparotta, 676 F.3d 213, 218 (1st Cir. 2012) ("argument consist[ing] of just two sentences and two cursory citations in his brief" is waived). In any event,

statutory standing is distinct from constitutional standing and it is only the latter that deprives a court of subject matter jurisdiction and is subject to review under Rule 12(b)(1). <u>See</u> <u>Katz v. Pershing, LLC</u>, 672 F.3d 64, 75-76 (1st Cir. 2012). As an argument to support a Rule 12(b)(6) dismissal, Forsyth cannot rely on the May 2013 letter and the argument otherwise fails for reasons previously explained.

## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[12] that the motion to dismiss (Docket Entry # 6) be **DENIED**.

> /s/ Marianne B. Bowler
> **MARIANNE B. BOWLER**
> United States Magistrate Judge

---

[12] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.